610 So.2d 619 (1992)
TOWNSEND & BOTTOM and Amerisure, Appellants,
v.
Raymond BONDS, Appellee.
No. 91-3770.
District Court of Appeal of Florida, First District.
December 14, 1992.
*620 Mathew D. Staver and Michael D. Rouse, Staver & Associates, Orlando, for appellants.
Thomas E. Thoburn, Bill McCabe of Shepherd, McCabe & Cooley, Longwood, for appellee.
WEBSTER, Judge.
In this workers' compensation case, the employer and carrier seek review of an order directing them to pay permanent total disability benefits from September 21, 1988, interest on all past-due compensation and taxable costs. They argue that the record does not contain competent substantial evidence to support the order. Instead, they contend that the correct date for commencement of permanent total disability benefits is December 23, 1990, the date as of which claimant was administratively accepted as permanently totally disabled. We agree with the employer and carrier. Therefore, we reverse.
Claimant sustained an injury to his knee on July 17, 1987. The injury was accepted as compensable. Claimant worked after the accident which injured his knee, until January 1988, when he had arthroscopic surgery. On September 21, 1988, claimant's treating physician, Dr. Guzman, placed him at maximum medical improvement, with a 4-percent permanent impairment of the whole body. Dr. Guzman did not suggest that claimant was permanently totally disabled. He did "recommend permanent restrictions stating no impact loading, and to walk within his own limits, pace and distance." He also noted that claimant did not believe that he could "operate a crane [claimant's previous occupation] at this time because of the continuous pressure on the heavy metal pedals." However, he recommended "cross-training," clearly indicating that he did not feel that claimant was permanently totally disabled.
Claimant was seen by Dr. Rudloff, a second orthopedic surgeon, on October 24, 1988, for an independent medical examination. As a result of his examination, Dr. Rudloff agreed with Dr. Guzman's opinion that claimant had sustained a 4-percent permanent impairment of the whole body. (However, he did not at that time render an opinion regarding maximum medical improvement.) Dr. Rudloff then began treating claimant, and continued to do so until December 1989. Dr. Rudloff likewise did not suggest that claimant was permanently totally disabled. In June 1989, Dr. Rudloff stated that claimant had "improved considerably since his last visit on aspirin and Darvocet"; and opined that claimant "likely could get back to some sort of job requiring less physical activity than his previous job [as a crane operator] if such duty can be found for him." On May 14, 1990, in response to a request from claimant's attorney, Dr. Rudloff wrote that he believed that claimant "probably did reach maximum medical improvement probably about the first time I saw him." However, at his subsequent deposition Dr. Rudloff conceded that his opinion regarding the time of maximum medical improvement "was a retrospective determination."
Claimant next began treating with Dr. Bambrick, a third orthopedic surgeon. Dr. Bambrick saw claimant between April and November 1990. Although Dr. Bambrick was of the opinion that claimant had sustained a permanent impairment, he was unwilling to assign a rating to that impairment. Likewise, Dr. Bambrick was unwilling to offer an opinion as to when, or whether, claimant had reached maximum medical improvement. However, he was willing to say that claimant "had reached a plateau in his recovery" around August 6, 1990.
*621 In September 1988, the employer and carrier placed claimant in rehabilitation. A November 1988 progress report reflects that claimant "was anxious to go back to the work force." According to the report, claimant said "that he is mechanically inclined and would like a position as a machinist where he was able to sit down and not bear alot [sic] of weight on his injured leg"; and that he "would not mind, or object, to [sic] being retrained for a position he was suited for." Similarly, a December 1988 progress report reflects that claimant stated "that he is most interested in rehabilitation and training"; and "that he is most interested in learning about electric motor, small gas engine repair, or small mechanical repair and is open to training." A January 1989 progress report reflects that "[claimant] states that his leg is feeling better and he wants the Doctor to reconsider him for release to work as a Crane Operator." However, by February 1989, although claimant was being provided with job leads for machine operator and other similar occupations at $4.00 to $5.00 per hour, claimant stated that he was unwilling to accept a job at such a low rate of pay, and that he would consider an entry level job only if the pay were in the range of $10.00 per hour. In March 1989, claimant stated that he would not consider work which he believed to be "beneath his station."
In March 1989, claimant expressed an interest in going "to school as a welder or a machinist, and requested testing to discover what his vocational options might be." In April 1989, claimant expressed an interest "in air conditioning repair or marine mechanics." When information was provided to claimant regarding vocational courses available at the local community college, claimant expressed interest in "heating & air conditioning, mechanical work (such as outboard motors), cabinet making, electrical work, welding, paint and auto body and machinist." Although claimant was urged to pursue vocational training, he never actually followed through regarding his expressed interests. Similarly, although job leads were regularly furnished to claimant, according to one of his rehabilitation providers, claimant became less and less willing to return to work. This rehabilitation provider said that claimant told her that "[h]e wanted to retire." Both of claimant's rehabilitation providers testified that they believed that claimant was employable in some type of light duty work. However, both also testified that claimant had been "inconsistent" in his interest in training and returning to work; and that, overall, claimant's attitude had been negative. Nevertheless, rehabilitation efforts continued until claimant was accepted as permanently totally disabled.
Claimant testified that he had not worked since shortly before the arthroscopic surgery in January 1988. However, he did not file his claim for permanent total disability benefits until December 3, 1990; and the employer and carrier accepted claimant as permanently totally disabled as of December 23, 1990. The parties stipulated that claimant had been paid temporary total disability benefits from July 17, 1987 (the date of injury) to September 30, 1988; and wage loss benefits from October 1, 1988 to December 22, 1990. The sole issue presented for decision by the judge of compensation claims was the date on which claimant should have been accepted as permanently totally disabled by the employer and carrier.
We believe that the outcome of this appeal is controlled by Marvin v. Rewis Roofing, 553 So.2d 314 (Fla. 1st DCA 1989). In Marvin, the claimant had sustained a compensable injury to his low back in 1984, reaching maximum medical improvement, with a 10-percent permanent impairment, in 1985. The claimant then sustained a second compensable injury to his shoulder. He reached maximum medical improvement as to the second injury in 1986, with an additional permanent impairment of four percent. However, the claimant's treating physician opined that the claimant was "capable of light work, and recommended retraining. At no time did [the physician] state that [claimant] was [permanently totally disabled] as a result of his injuries." Id. at 315. After the claimant had been released to light duty work, the employer *622 and carrier "commenced rehabilitation efforts, providing [claimant] with a rehabilitation counselor and at one point enrolling him in a technical course at a local school." Id. The employer and carrier did not accept the claimant as permanently totally disabled until over a year later, after they had received "a rehabilitation report opining that it was unlikely that [claimant] could be returned to work... ." Id. The claimant argued that he had been permanently totally disabled since the date on which he reached maximum medical improvement from his second injury and that, therefore, he was entitled to receive supplemental benefits from that date, rather than from the later date on which the employer and carrier had accepted him as permanently totally disabled. From an adverse decision, the claimant appealed.
On appeal, this court affirmed. In doing so, we said that "[maximum medical improvement] is not, in and of itself, synonymous with [permanent total disability] in the absence of additional facts such as an obviously incapacitating injury or concurrent medical opinion of [permanent total disability]...." Id. at 316. We explained our decision as follows:
The injuries to [claimant's] back and shoulder were not obviously incapacitating, and it was the opinion of [claimant's] treating physician that he could perform light work after [maximum medical improvement] if retraining was provided. Therefore, there were no facts from which a [permanent total disability] determination could be made on the date of [maximum medical improvement]... .
Rather, it was not until [claimant] had conducted an extensive unsuccessful job search, and the employer/carrier had made intensive unsuccessful rehabilitation efforts, that [claimant] was administratively accepted as [permanently totally disabled]... . There was ... no evidence presented to support ... a finding ... that [permanent total disability] should have been accepted by the [employer/carrier] at any earlier date.
Id.
As in Marvin, here we are unable to find any evidence to support the conclusion that the employer and carrier should have accepted claimant as permanently totally disabled on a date earlier than they did. Claimant's knee injury was not "obviously incapacitating"  the two physicians (Drs. Guzman and Rudloff) who rendered opinions thought that it constituted only a 4-percent permanent impairment of the whole body. None of the physicians testified that claimant was permanently totally disabled on September 21, 1988 (the date as of which the judge of compensation claims concluded that claimant had reached maximum medical improvement). In fact, none of the physicians testified that claimant was permanently totally disabled. When Dr. Guzman recommended "cross-training," the employer and carrier immediately placed claimant in rehabilitation. Efforts to assist claimant either to find work within his restrictions or to retrain for a new occupation continued until claimant was accepted as permanently totally disabled. It was not until sometime in late 1990 that it became apparent that (largely because of claimant's attitude) those efforts would be unavailing. At that time, the employer and carrier accepted claimant as permanently totally disabled.
Because we conclude that the record does not contain competent substantial evidence to support a determination that the employer and carrier should have accepted claimant as permanently totally disabled on any date earlier than December 23, 1990, we reverse the direction that the employer and carrier pay claimant permanent total disability benefits from September 21, 1988. Because claimant has not prevailed on this issue, he is not entitled to interest, taxable costs or attorney fees. Griffin v. Orlando Regional Medical Center, 578 So.2d 448 (Fla. 1st DCA 1991).
REVERSED.
BOOTH and SHIVERS, JJ., concur.